The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Douglas E. Berger, the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms and adopts the Opinion and Award of the Deputy Commissioner, with minor modifications. Prior to the hearing, the parties entered into a Pre-Trial Agreement. This Pre-Trial Agreement is incorporated herein by reference.
 ***********
The Full Commission finds as fact and concludes as matters of law the following:
 STIPULATIONS
1. All stipulations contained in the Pre-Trial Agreement are received into evidence.
2. A Form 28B marked as stipulated exhibit 1 was received into evidence.
3. Subsequent to the hearing, medical records from Dr. Zastrow marked as stipulated exhibit 2 were received into evidence.
4. Plaintiff's average weekly wage at the time of his compensable injury by accident was $666.00.
 ***********
Based upon all of the competent evidence of record, the Full Commission adopts the findings of fact of the Deputy Commissioner as follows:
 FINDINGS OF FACT
1. On January 19, 1995, plaintiff sustained a compensable injury by accident to his lower back whereby he sustained a disc herniation at the L5-S1 region while throwing a trash bag into a dumpster. Plaintiff received temporary total disability compensation for the time period from January 20, 1995 until February 17, 1995. A Form 21 Agreement was signed by both parties on March 22, 1995 and was approved by the Industrial Commission on June 12, 1995. A Form 28B dated April 12, 1995 was received by the Industrial Commission on June 23, 1995. No additional agreements for compensation have been entered into by the parties and approved by the Industrial Commission.
2. Beginning on January 19, 1995, plaintiff began a course of treatment under the direction of Dr. Bernstein for his compensable disc herniation at the L5-S1 region. On February 17, 1995, Dr. Bernstein released the plaintiff to return to light duty work.
3. After February 17, 1995, plaintiff continued to experience low back pain. On March 10, 1995, Dr. Bernstein referred plaintiff to neurosurgeon, Dr. Petty, for further evaluation. Under the direction of both Dr. Bernstein and Dr. Petty, plaintiff began a course of conservative treatment that included an exercise program and physical therapy. On June 15, 1995, Dr. Petty advised the plaintiff that he needed to consider having surgical treatment. On June 28, 1995, plaintiff informed Dr. Bernstein that he did not want surgery. From June 28, 1995 to December 7, 1995, plaintiff continued to perform light duty work. From December 7, 1995 to January 3, 1996, Dr. Bernstein restricted plaintiff from returning to work. During this period of time plaintiff underwent additional physical therapy.
4. On January 3, 1996, Dr. Bernstein released the plaintiff on an as needed basis. An examination by Dr. Bernstein revealed that plaintiff could bend to 80 degrees at the spine in flexion without symptoms. Plaintiff was able to extend his back 20 degrees and laterally rotate his torso to the right and left about 45 degrees without symptoms. Plaintiff could lift his right leg up 45 degrees and his left leg 80 degrees. Dr. Bernstein did not observe any other overt gross abnormalities. Dr. Bernstein gave plaintiff permanent restrictions that included minimal bending at the waist and occasional lifting up to 20 pounds. The next time that plaintiff was seen by Dr. Bernstein was on March 4, 1996.
5. On March 6, 1996, plaintiff returned to Dr. Petty for further treatment. Plaintiff reported to Dr. Petty that his back condition had become worse. Plaintiff was experiencing numbness in his right foot. Dr. Petty ordered plaintiff to undergo another CT scan. A March 8, 1996 CT scan revealed that plaintiff's disc herniation at the L5-S1 region was compressing on the origin of the S1 nerve root. The disc herniation was producing a mild to moderate constriction of the thecal sac. The disc herniation extended into the inferior aspect of the right L5-S1 neuroforamen. The L5 nerve root appeared to exit without compression. This CT scan provided objective verification that plaintiff's report to Dr. Petty that his back condition had worsened was accurate. Plaintiff had experienced a further degeneration of the disc at L5-S1 since the time that plaintiff underwent a January 24, 1995 CT scan.
6. On March 18, 1996, plaintiff reported to Dr. Bernstein that Dr. Petty had recommended surgery. Plaintiff wanted a second opinion from Dr. Adamson before he followed this recommendation. Dr. Bernstein authorized the plaintiff to be out of work for up to two months after any scheduled surgery and up to two weeks if there was no scheduled surgery. Dr. Bernstein did not order the plaintiff to remain in bed until this surgery was performed. On March 28, 1996, Dr. Petty scheduled the plaintiff to have disc surgery.
7. Between March 18, 1996 and April 25, 1996, plaintiff received benefits under a salary continuation plan from the defendant-employer. No benefits were paid to the plaintiff during this time period pursuant to the filing of any forms with the Industrial Commission. No Form 26 Agreement was approved by the Industrial Commission, and no Form 62 seeking to reinstate plaintiff's benefits was filed with the Industrial Commission.
8. On April, 13, 1997, April 16, 1997 and April 20, 1997, plaintiff was observed and videotaped at a video store managed by his wife. A videotape of plaintiff performing activities on each of these days was made available to Dr. Bernstein by the defendant-employer. Based upon this videotape, Dr. Bernstein changed his medical opinion as to whether plaintiff should remain out of work during this time period. The defendant-employer knew that Dr. Bernstein had changed his medical opinion concerning whether plaintiff should continue to be restricted from returning to work before the plaintiff was ever informed of these changes in Dr. Bernstein's opinion. On April 24, 1996, Dr. Bernstein notified Dr. Petty of his observations and informed Dr. Petty that the symptoms that plaintiff presented to him were inconsistent with what he had observed on the videotape. Dr. Petty agreed with Dr. Bernstein that it would be appropriate to postpone plaintiff's surgery, saying:
 "I was sent a videotape today of Mr. Lewis. His movements seemed to have very little limitation on the portion of the tape that I saw, including his ability to ride a motorcycle without difficulty. If there is some question about his clinical state, I believe his surgery should be delayed until this is cleared."
9. After reviewing the videotape, Dr. Bernstein was of the opinion that the number of times that plaintiff bent his waist was frequent as opposed to minimal. Dr. Bernstein did not place a specific limit as to how often the plaintiff could bend at the waist when he released him on January 1, 1996. Plaintiff's regular job duties required him to constantly bend to clean out from under seats on the 737, 300, and 400 jets. As compared to the amount of bending involved in his regular job, the amount of bending at the waist by the plaintiff in the videotape is minimal. The videotapes are approximately three hours in length over a three day period. Plaintiff bends an average of six to eight times per hour on the videotapes. Plaintiff periodically rests his upper torso by placing his elbows on the counter during the three hours of videotape.
10. After reviewing the videotape, Dr. Bernstein said he was of the opinion that plaintiff bent his waist in a manner inconsistent with what he had directly observed the plaintiff be able to do. However, Dr. Bernstein's records show that since January 3, 1996, plaintiff had been able to bend his waist up to an 80 degree angle and the videotape reveals plaintiff bending his waist behind the counter no more than approximately 80 degrees. Therefore, Dr. Bernstein's change of opinion after viewing the videotape is in direct conflict with his personal observations recorded prior to the videotape and is not deemed credible.
11. After reviewing the videotape, Dr. Bernstein said he was of the opinion that plaintiff bent his waist in awkward positions. On January 3, 1995, plaintiff was able to rotate at a 45 degree angle. Dr. Bernstein had not conducted any prior physical examinations that tested the ability of the plaintiff to bend his waist in a manner comparable to what he observed on the videotape.
12. After reviewing the videotape, Dr. Bernstein was of the opinion that plaintiff walked briskly. Dr. Adamson's deposition testimony revealed that constant walking was therapeutic for a back injury.
13. After reviewing the videotape, Dr. Bernstein, said he was of the opinion that plaintiff did not exhibit any discomfort. Dr. Bernstein was unable to identify any observations that he had made of the plaintiff on the videotape that contradicted what he observed the plaintiff exhibit in his office.
14. After reviewing the videotape, Dr. Bernstein said he was of the opinion that plaintiff wiped off the motorcycle aggressively. On January 1, 1996, Dr. Bernstein had released the plaintiff to perform light duty work that included cleaning counters. Plaintiff was not restricted as to how aggressively he could clean those counters.
15. After reviewing the videotape, Dr. Bernstein said he was of the opinion that plaintiff should not have been able to straddle the motorcycle without difficulty and without any hesitation. On March 18, 1996, Plaintiff demonstrated to Dr. Bernstein that he was able to lift his right leg at a 30 degree angle. Dr. Bernstein did not observe the plaintiff's ability to lift his leg out to the side and then in an upward motion during any of his examinations of the plaintiff.
16. Dr. Bernstein's January 1, 1996 medical records do not contain any notation that plaintiff reported difficulty with sitting or standing for prolonged periods. Between January 1, 1996 and March 18, 1996, Dr. Bernstein had not placed any restriction on the length of time plaintiff could sit or stand while performing light duty work. Dr. Bernstein's March 18, 1996 medical records do not contain any notation that plaintiff was no longer able to sit or stand for prolonged periods of time.
17. Dr. Bernstein testified and recorded in his medical records of April 24, 1996 that the reason that he restricted the plaintiff from returning to work on March 18, 1996 was because the plaintiff reported to him that he had significant pain and was unable to sit or stand for prolonged periods of time. Plaintiff did not report to Dr. Bernstein that he was unable to sit or stand for prolonged periods of time prior to being restricted from returning to work on March 18, 1996. Dr. Bernstein restricted plaintiff to remain out of work in order for plaintiff to make preparations for surgery. (The April 1, 1996 date was the date plaintiff was to return to see Dr. Bernstein for any further authorization to remain out of work if no surgery was scheduled.) Plaintiff underwent a number of tests including bloodwork in preparation for surgery.
18. Dr. Bernstein testified that he suspected plaintiff of symptom magnification during the course of his treatment because plaintiff would report leg pain during a straight leg test while not reporting pain while performing a flip test. A straight leg test involves the lifting of the leg when standing while a flip test involves the lifting of a leg when sitting. In addition to this variance in reports of pain, Dr. Bernstein suspected symptom magnification because plaintiff would report fluctuations in the level of pain he was experiencing in his legs utilizing the same test on different examinations during the course of his treatment of the plaintiff. The Full Commission gives greater weight to the opinion of neurosurgeon, Dr. Adamson, who testified that a disc herniation at the L5-S1 level was consistent with both a positive straight leg test and a negative flip test. Dr. Adamson also testified that fluctuations in pain in the same location were encouraging signs that conservative therapy was working.
19. Plaintiff was taking Motrin at the time that he was being videotaped. The Motrin helped plaintiff have an ability to control the symptoms that he reported to Dr. Petty, Dr. Adamson and Dr. Bernstein.
20. The videotape revealed plaintiff engaging in proper lifting techniques when he bent over in open view in front of the counter.
21. The videotape revealed plaintiff lifting items consistent with the lifting restrictions set forth by Dr. Bernstein.
22. Dr. Adamson opined that he had no basis to believe that the plaintiff intentionally overstated his pain symptoms during any of the office visits that plaintiff had with Dr. Adamson.
23. Plaintiff was terminated as of April 25, 1996 because of the defendant employer's belief that plaintiff had violated company policy establishing immediate dismissal for misrepresentation to obtain employee benefits. The defendant-employer based this decision to terminate the plaintiff upon Dr. Bernstein's opinion that plaintiff's report of symptoms to him were inconsistent with what he observed plaintiff do on the videotape.
24. Based upon a review of the videotape and a review of Dr. Bernstein's written records prior to the videotaping, the Full Commission finds that plaintiff did not engage in any misrepresentation to Dr. Bernstein and/or the defendant-employer in order to obtain employee benefits from the defendant-employer. While Dr. Adamson testified that plaintiff's motions on the videotape appeared to be inconsistent with refractory pain, he was unable to give an opinion as to whether plaintiff would have been capable at that time of performing a job that required occasional lifting of up to 30 pounds and minimal bending at the waist based on videotaping during "a fairly limited span of time."
25. The activities on the videotape do reveal that as of April 20, 1995, plaintiff could engage in light duty work within lifting restrictions. However, plaintiff was out of work on this occasion under doctor's orders awaiting his surgery date.
26. The activities on the videotape do not reveal that plaintiff was engaging in gainful employment. Plaintiff was not an employee or co-owner of the video store. Plaintiff did not earn any wages or salary for the activities he performed at the video store. Plaintiff was at the video store primarily to keep his wife company, watch over his son, and provide some security to his wife when closing the video store. Co-signing of the video store lease by plaintiff and his wife was necessary so that their entirety property could be attached in case of default and is not conclusive evidence that the video store was co-owned by plaintiff and his wife.
27. The defendant-employer sent plaintiff a letter indicating that plaintiff was deemed to have resigned on April 26, 1996 for violating a labor agreement requiring that an employee had to get prior permission to engage in gainful employment while out on personal leave for more than seven days. The defendant-employer claims to have also terminated the plaintiff on April 26, 1996 for violation of this labor agreement. This termination took place on April 26, 1996 while the other termination took place on April 25, 1996.
28. Following the April 25 and 26 terminations of the plaintiff, plaintiff has continued to be restricted from lifting heavy items as a result of his January 19, 1995 compensable injury by accident.
29. From April 28, 1996 to September 5, 1996, plaintiff attempted to locate work. During this time period, plaintiff received unemployment benefits.
30. The week of November 21, 1996, plaintiff obtained employment with Allied Security, Inc, as a security guard making $7.00 an hour.
31. Plaintiff has not reached maximum medical improvement with regard to his compensable herniated disc at L5-S1.
32. Plaintiff cannot continue to have a meaningful physician/patient relationship with Dr. Bernstein. Dr. Bernstein did not inform plaintiff that he had changed his medical opinion prior to informing the defendant-employer. Dr. Bernstein's report to the defendant-employer resulted in plaintiff losing his job with the defendant-employer.
33. A comprehensive medical evaluation that includes a functional capacity evaluation is reasonably necessary in order to determine what treatment measures, medications and type of therapy plaintiff needs to undergo in order to lessen his back and right leg pain.
34. Plaintiff's post-injury average weekly wage is $280.00. (Seven dollars an hour times forty hours a week equals $280.00.).
 ***********
The foregoing findings of fact engender the following
 CONCLUSIONS OF LAW
1. The defendant-employer has failed to show by the greater weight of the evidence that the plaintiff was terminated for misconduct or fault unrelated to the compensable injury. Plaintiff has not engaged in conduct that can be deemed a constructive refusal that would allow the defendant-employer to deny benefits for lost earnings. Plaintiff was terminated at a time when he could only perform work involving lifting restrictions imposed as a result of the January 19, 1995 compensable injury by accident. Plaintiff was terminated at a time when he had not reached maximum medical improvement. Plaintiff is entitled to receive additional compensation benefits for lost earnings following his termination by the defendant-employer. Seagraves v. Austin Company, 123 N.C. App. 228,472 S.E.2d 397 (1996).
2. Plaintiff is entitled to receive temporary total disability benefits for the time period beginning April 26, 1996 to the week of November 21, 1996 at a compensation rate of $444.00 per week. N.C. Gen. Stat. § 97-29.
3. Defendant is entitled to receive credit for the unemployment benefits plaintiff received during the time period beginning April 26, 1996 to the week of November 21, 1996. N.C. Gen. Stat. § 97-42.
4. Plaintiff is entitled to temporary partial disability compensation at a rate of sixty-six and two thirds of the difference between $666.00 and $280.00 for the time period beginning November 21, 1996 to the present and continuing. N.C. Gen. Stat. § 97-29.
5. Plaintiff is entitled to have the defendant provide all medical treatment arising from the January 19, 1995 compensable injury by accident to the extent it tends or tended to effect a cure, give relief, or lessen plaintiff's disability. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay to the plaintiff temporary total disability compensation at a rate of $444.00 per week for the time period beginning April 26, 1996 to the week of November 21, 1996. This amount has accrued and shall be paid in a lump sum subject to a credit for unemployment compensation benefits received by the plaintiff during this time period and subject to the attorney's fee approved below.
2. Defendant shall pay to the plaintiff temporary partial disability compensation at a rate of $257.46 per week for the time period beginning the week of November 21, 1996 to the present and continuing until further order of the Industrial Commission. The portion of this amount that has accrued shall be paid in a lump sum subject to the attorney's fee approved below.
3. Plaintiff shall no longer be required to receive medical treatment from Dr. Bernstein. Defendant shall pay all medical expenses incurred or to be incurred for the treatment of the plaintiff's disc herniation at the L5-S1 region including a comprehensive medical evaluation to be administered and directed under the supervision of another physician other than Dr. Bernstein. The defendant shall authorize another treating physician other than Dr. Bernstein to treat the plaintiff on an ongoing basis and to prescribe ongoing pain medications.
4. A reasonable attorney's fee of twenty-five percent of the compensation due plaintiff under paragraphs 1 and 2 of this Award is approved for plaintiff's counsel and shall be paid as follows: Twenty-five percent of the lump sum due plaintiff shall be deducted from that sum and paid directly to plaintiff's counsel. Thereafter, every fourth check shall be paid directly to counsel for the plaintiff.
5. Defendant shall pay an expert witness fee in the amount of $265.00 to Dr. Adamson.
6. Defendant shall pay the costs.
7. Plaintiff's claim for attorney's fees and sanctions for the defendant's termination of benefits on or about the week of April 25, 1996 is DENIED.
8. Interest on this award at the rate of eight per cent per annum shall run from 6 January 1997, the date of the hearing before the Deputy Commissioner.
 ***********
This 11th day of June 1998.
 S/ ________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ _________________ CHRISTOPHER SCOTT COMMISSIONER
S/ _________________ DIANNE C. SELLERS COMMISSIONER